# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSARIO ALONSO,<br><br>            Plaintiff,<br><br>      v.<br><br>BLACKSTONE FINANCIAL GROUP.<br>LLC, and JASON ELSEN,<br><br>            Defendants. | Case No.  1:11-cv-01693-SAB<br><br>MEMORANDUM OF DECISION |

**I.**

**INTRODUCTION**

This action concerns a financial obligation to J.P Morgan Chase Bank which was assigned to Defendant Blackstone Financial Group, LLC. ("Blackstone") for collection.  Plaintiff Rosario Alonso filed this action on October 10, 2011 alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and the Rosenthal Fair Debt Collection Act ("RFDCPA"), Cal. Civ. Code §§ 1788-1788.32.   On February 26, 2013, Plaintiff filed an amended complaint adding Defendant Jason Elsen ("Elsen") as a defendant in this action. Defendant Blackstone filed a motion to dismiss on May 13, 2013.

On May 20, 2013, Defendants Blackstone and Elsen each filed a motion for summary judgment.  On August 2, 2013, an order issued granting in part and denying in part Defendant

1   Elsen's motion to dismiss and denying Defendants Blackstone and Elsen's motions for summary

2   judgment.

3          A bench trial was held on November 13 and 14, 2013 before the undersigned.  Plaintiff

4   was represented by counsel William Krieg and F. John Gist and Defendants were represented by

5   counsel Michael Goode.   Closing arguments were heard on November 19, 2013.   Having

6   considered the testimony of the witnesses and those exhibits that were admitted at trial, the Court,

7   by this memorandum of decision, issues its findings of fact and conclusions of law pursuant to

8   Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set for the below, the Court

9   concludes that the evidence proves that Defendants Blackstone and Elsen have violated the

10  FDCPA and RFDCPA.

## II.

## FINDINGS OF FACT

### A.      Defendants Blackstone and Elsen

          After being involved in the debt collection field for a number of years, Defendant Elsen

established Defendant Blackstone in October of 2009.  (Partial Transcript of Proceedings Day

One (hereafter T.R.) 94:8-15, 99:12-14, 100:24-101:1, ECF No. 101.[1])  Defendant Elsen was the

sole owner and manager of Defendant Blackstone.  (T.R. at 99:2-11.)  Defendant Blackstone is,

and at the time of the incidents alleged in this action was, engaged in the collection of debts.

(T.R. at 99:15-18.)  Defendant Blackstone obtained accounts through credit portfolios which are

sold off by creditors and were purchased by Defendant Elsen.  (T.R. at 99:19-100:23.)  Defendant

Elsen owns three debt collection agencies that are currently engaged in collecting debt.  (T.R. at

93:1-11.)

          All of Defendant Blackstone's employees were recruited, interviewed, and hired by

Defendant Elsen.  (T.R. at 101:2-20, 102:7-10; 103:15-21; 110:10-12.)  Any background checks

on employees were done by Defendant Elsen.  (T.R. at 101:22-109:17.)  Defendant Elsen created

---

[1] The Court requested the testimony of Plaintiff and Defendant Elsen be transcribed.  Citation to the testimony of these witnesses is included in the findings of fact.  Those findings of fact based upon the testimony of Mr. Alonso and Ms. Reyes do not include citations to the record.

1   all the training materials and trained all of Defendant Blackstone's employees.  (T.R. at 113:18-

2   114:6; see Exhibits J-21, J-22.)  Defendant Elsen would train each employee by personally sitting

3   with the employee and teaching the employee how to skip trace, how to notate the account, and

4   how to enter information into the Debtor History Report.   (T.R.114:20-21; 142:4-13; Partial

5   Transcript of Proceedings Day 2 (hereafter T.R.2) 3:22-4:24; 7:12-8:2, ECF No. 102.)   The debt

6   collectors were to go online and read the regulations on debt collection as part of their training.

7   (T.R. at 114:12-20.)   The scripts that the debt collectors used when contacting debtors were

8   created by Defendant Elsen.  (T.R. 114:22-118:15; see Exhibits J-19, J-20.)

9       Debt collectors were paid $10.00 to $12.00 per hour with the ability to receive bonuses.

10   (T.R. at 112:4-10.)  Under the bonus structure established by Defendant Elsen, the debt collectors

11   were broken into teams.  (T.R. 113:2-9.)  Each team was given a target and if they exceeded

12   that target they would receive a bonus.  (T.R. at 113:6-13.)

13       During the period of time in which Defendant Blackstone was actively engaged in debt

14   collection activity, Defendant Elsen was at the business whenever debt collection activities were

15   taking place.  (T.R. at 126:3-14; 126:20-127:5.)  The debt collectors were in cubicles in the boiler

16   room and Defendant Elsen would walk the floor monitoring their conversations.  (T.R. at 110-20-

17   112:3, 120:23-12; 126:3-12.)   If a debtor who had property or a job refused to pay, the debt

18   collector would refer the account to Defendant Elsen who would prepare the account to be sent to

19   an attorney so a lawsuit could be filed against the debtor.  (T.R. at 119:9-120:20.)

20       During the period that Defendant Blackstone was actively collecting debt, Defendant

21   Elsen did not miss a single day of work.  (T.R. 126:6-11.)  The phone for Defendant Blackstone

22   was located on Defendant Elsen's desk; and he was one of the primary individuals who would

23   answer incoming calls.  (T.R. at 135:9-25; T.R.2 at 16:22-17:2, 17:19-18:4.)  When Defendant

24   Elsen answered the phone, he would route the call to whoever his top collectors were regardless

25   of which debt collector had been assigned the account.  (T.R. at 136:4-24; T.R.2 at 15:8-16:7.)

26       Defendant Elsen collected on at least two accounts while Defendant Blackstone was

27   operational.  He worked the first account that was collected by Defendant Blackstone.  (T.R. at

28   139:9-140:4.)   After purchasing a debt in which Defendant Elsen knew the debtor's father,

1   Rodney Eason, Defendant Elsen contacted him and attempted to negotiate a settlement on his

2   daughter's account. (T.R.2 at 50:4-11; 52:16-54:5.) This resulted in a lawsuit being filed against

3   Defendant Blackstone. (See Exhibit 6.)

4          The debt collectors used aliases in their collection attempts and no records were kept of

5   the aliases used by the employees. (T.R. at 132:20-133:23.) The portfolio number which was

6   assigned to the account when it was purchased was adopted by Defendant Blackstone. (T.R.2 at

7   20:20-21:11.) Accounts were identified by the portfolio number followed by three initials for the

8   alias used by the debt collector assigned to the account. (T.R.2 at 22:23-23:1.)

9          Defendant Blackstone stopped actively collecting on new accounts in October or

10  November of 2010. (T.R. at 140:6-20.) During the time that Defendant Elsen was preparing to

11  cease collection activity by Defendant Blackstone, he created two new debt collection companies,

12  Edison Park and Steel Morgan. (T.R. at 130:8-13.) Some of Defendant Blackstone's employees

13  were hired by Defendant Elsen to work for these new companies. (T.R. at 131:9-22; T.R.2 at

14  44:8-21.) However, during his depositions, Defendant Elsen was unable able to identify any

15  individual who worked for Defendant Blackstone, other than Sarah Blankenship who was

16  identified in a lawsuit filed against Defendant Blackstone. (T.R. at 130:20-131:14; see Exhibit 9

17  at ¶ 11.)

18         Defendant Elsen did not retain any personnel records for Defendant Blackstone, nor is he

19  sure if any such records ever existed. (T.R. at 131:23-132:19.) No records were kept to identify

20  the aliases that were used by any debt collector. (T.R. at 133:5-135:8; 146:13-147:10.)

21         Defendant Blackstone is still collecting on accounts in which payment arrangements were

22  set up during the time the company was in operation or in which a lawsuit was filed by Defendant

23  Blackstone. (T.R. at 138:21-139:8.) If a payment is missed, credit card information needs to be

24  updated, or a check bounces, Defendant Elsen or his accountant will contact the debtor regarding

25  the issue. (T.R. at 140:21:141:5.) Since 2010, Defendant Elsen has been the only employee of

26  Defendant Blackstone. (T.R. at 140:6-141:5.)

27       **B.      Plaintiff Alonso**

28         Plaintiff Alonso has worked as a patient representative at Fresno Community Hospital for

approximately 15 years.  (T.R. at 1:20-23.)  Plaintiff and Michael Alonso were together for ten years before they married in 2000.  (T.R. at 2:21-25, 3:10-13; Testimony of Michael Alonso.) Plaintiff and Michael Alonso divorced in 2002.  (T.R. at 3:1-4.)  During the time they were married, Plaintiff and Michael Alonso owned a home together and, after they were divorced Plaintiff continued living there until 2008.  (T.R. at 3:17-4:3.)  The Alonso's had a cordial relationship following their divorce and Mr. Alonso maintained the residence during the time that Plaintiff continued to live in the home alone.  (Testimony of Michael Alonso.)

After Plaintiff fell behind in her payments on a Chase Bank credit card, Defendant Elsen purchased the debt for Defendant Blackstone.  (T.R. at 110:23-111:14; T.R.2 at 157:21-158:2.) The account was assigned to a debt collector whose alias initials were EMC.  (T.R.2 at 12:12-15:3.)

### C.     Events of October 11, 2011

In October 2010, Mr. Alonso was a pharmacy manager at Renge Pharmacy in Fresno. (Testimony of Michael Alonso.)  In his position as a pharmacy manager, Mr. Alonso would occasionally be contacted by a police officer regarding responding to subpoenas.  (Testimony of Michael Alonso.)  On October 11, 2010, Mr. Alonso was informed by his boss that an officer was on the line.  (Testimony of Michael Alonso.)  When Mr. Alonso answered the phone, the caller identified himself as Officer Carmichael from Blackstone.[2]  (Testimony of Michael Alonso.)  The caller then began asking questions about Plaintiff.  (Testimony of Michael Alonso.)  The caller informed Mr. Alonso that he was trying to find Plaintiff in order to collect on a debt.  (Testimony of Michael Alonso.)  Until the caller informed Mr. Alonso that he was attempting to collect a debt, Mr. Alonso was not aware that the caller was not a police officer.  (Testimony of Michael Alonso.)

The caller told Mr. Alonso that his wages could be garnished because of the debt.

---

[2] During the trial, Mr. Alonso testified that the caller identified himself as Officer and a name that included Michael. Mr. Alonso stated that he did not remember exact name given, but because his name is Michael he does remember the name included Michael.  Mr. Alonso testified that he called Plaintiff and gave her the name that was given to him by the caller.  Plaintiff testified that, while she was on the phone with Mr. Alonso, she wrote down the name that Mr. Alonso gave her, which was Officer Carmichael.  Exhibit J-2.  Based upon this testimony, the Court finds that the caller identified himself to Mr. Alonso as Officer Carmichael.

1   (Testimony of Michael Alonso.)  Mr. Alonso asked how his wages could be garnished because he

2   and Plaintiff were divorced.  (Testimony of Michael Alonso.)  The caller asked Mr. Alonso where

3   Plaintiff was because he wanted to get in touch with her.  (Testimony of Michael Alonso.)  Mr.

4   Alonso stated that she worked for a hospital.  (Testimony of Michael Alonso.)  The caller asked

5   Mr. Alonso for Plaintiff's phone number but Mr. Alonso did not provide the information.

6   (Testimony of Michael Alonso.)  The caller gave Mr. Alonso a case number and phone number,

7   and asked him to give Plaintiff the message to call him right away.  (Testimony of Michael

8   Alonso.)

9       Within the hour, around 3:00 p.m., Mr. Alonso called Plaintiff at work.  (T.R. at 10:14-21;

10   (Testimony of Michael Alonso.)  He asked her if she was in trouble.  (T.R. at 10:22-23.)  Mr.

11   Alonso told Plaintiff that he had received a call from an officer and asked why he was being

12   called at work regarding her personal business.  (T.R. at 10:25-11:4; Testimony of Michael

13   Alonso.)  Mr. Alonso gave Plaintiff the message that she needed to call Officer Carmichael

14   regarding case no. 10CA26450MB and gave her the phone number and company name.  (T.R. at

15   11:5-10, 25:6-26:11; Testimony of Michael Alonso; Exhibit J-2.)

16       Plaintiff was upset, worried, and scared by the message she had received from Mr.

17   Alonso.  (T.R. at 12:3-7.)  Plaintiff returned the call from work at about 3:00 p.m.  (T.R. at 12:11-

18   14, 15:24-16:2.)  When she dialed the number provided to her by Mr. Alonso, a woman answered

19   the phone.  (T.R. at 12:15-18.)  Plaintiff asked for Officer Carmichael and told the woman that

20   she had a case number.  (T.R. at 12:18-13:11.)  Plaintiff was placed on hold.  (T.R. at 12:19-20.)

21   A man came on the line and identified himself as Steven Darwin.  (T.R. at 13:12-16, 29:5-12.)

22   Mr. Darwin told Plaintiff that he was associated with Officer Carmichael, was taking Officer

23   Carmichael's calls, and would relay the message to him.  (T.R. at 13:17-22.)  Mr. Darwin told

24   Plaintiff that he needed to get information from her to collect on a debt and that she owed

25   $13,894.00.  (T.R. at 13:25-14:3, 28:5-13.)  He told her that he wanted $7,000.00 or $8,000.00.

26   (T.R. at 15:3-4, 21:21-22-5, 27:14-23, 28:14-23; Exhibit J-2.)

27       Mr. Darwin was suggesting different payment arrangements and Plaintiff told him that she

28   did not have the money.  (T.R. at 15:3-9.)  Mr. Darwin told Plaintiff that she needed to make

arrangements to pay the debt or he would have Officer Carmichael escort her from her place of employment.  (T.R. at 14:7-25; 15:17-19,16:5-9; 29:17-23.)  Plaintiff felt threatened and agreed to pay $100.00 by the end of the day.  (T.R. at 16:12-16.)  Plaintiff understood that Mr. Darwin intended to withdraw an additional $400.00 from her account on Friday.  (T.R. at 16:8-11, 17:2-11, 22:18-25.)

Following this conversation, Plaintiff contacted her mother, Amelia Reyes.  (T.R. at 18:1-3.)  Plaintiff told her mother that she had been contacted regarding some money she owed and the police were involved.  (T.R. at 18:5-8; Testimony of Amelia Reyes.)  Plaintiff was upset and crying.  (Testimony of Amelia Reyes.)  Plaintiff asked if she could borrow the $100.00.  (T.R. at 18:1-8; Testimony of Amelia Reyes.)  Her mother agreed to lend Plaintiff the money.  (T.R. at 18:1-15; Testimony of Amelia Reyes.)

Plaintiff went to her mother's house, and she was crying and worried.  (Testimony of Amelia Reyes.)  Plaintiff told her mother that if the money was not in the bank by 5:00 p.m. an officer was going to come looking for her.  (T.R. at 18:23-19:2; Testimony of Amelia Reyes.)  Plaintiff and her mother went to Plaintiff's bank so she could deposit the $100.00 into her account.  (T.R. at 19:17-25; Testimony of Amelia Reyes.)  After Plaintiff had deposited the $100.00 in her account, she called Mr. Darwin back and gave him her account information so he could withdraw the $100.00 from her account.  (T.R. at 20:3-8; Testimony of Amelia Reyes.)

Plaintiff took Ms. Reyes back home.  (T.R. at 24:15; Testimony of Amelia Reyes.)  Plaintiff was feeling very stressed and was achy and nauseous.  (T.R. at 24:16-18.)  She told Ms. Reyes that she needed to get home to take her medication because her lupus was beginning to act up.  (Testimony of Amelia Reyes.)

Defendant Blackstone posted a $100.00 payment to Plaintiff's account at 5:15 p.m.  (Exhibit J-18 at 2.)

**D.      Subsequent Events**

Plaintiff had been diagnosed with lupus in the early 2000s and was on a medication regimen which controlled her symptoms.  (T.R. at 4:24-5:7, 7:1-9.)  Due to the stress that Plaintiff was experiencing, her lupus flared up.  (T.R. at 31:12-21.)  Plaintiff began experiencing muscle

1   aches and pains, stiffness, fatigue, nausea and vomiting, and difficulty sleeping and eating.  (T.R.

2   at 31:20-32:3.)  Plaintiff had been seeing a lupus specialist in San Francisco several times a year

3   who prescribed a medication regimen to treat her condition.  (T.R. 32:7-25.)  The specialist had

4   informed Plaintiff how she was to treat her symptoms should she experience a flare up, so

5   Plaintiff followed the doctor's advice and did not visit her doctor due to the flare up of her lupus.

6   (T.R. at 34:7-25, 82:1-12.)

7        In the days following the contact with Defendant Blackstone, Plaintiff began using

8   Naprosyn, a pain relief medication that had been proscribed by her physician.  (T.R. 15:14-15.)

9   Plaintiff was concerned with becoming addicted to the Naprosyn so after three days she stopped

10   taking the Naprosyn and used over the counter Tylenol or Advil to treat her pain.  (T.R. at 36:21-

11   37:4, 86:6-15.)  In addition, Plaintiff added a dose of her maintenance medications each day and

12   took DEHA to control her symptoms.  (T.R. at 35:1-13, 77:13-78:16.)  DEHA is a supplement

13   that Plaintiff's doctor had prescribed to treat her rash and inflammation.  (T.R. at 35:19-36:2.)

14        On October 14, 2010, Plaintiff called Defendant Blackstone to get their fax number.  (T.R.

15   at 29:24-30:5.)  She then faxed a letter to Defendant Blackstone informing them that they were

16   not to take any more payments from her account.  (T.R. at 30:16-24.)  Defendant Blackstone did

17   not take any additional payments from Plaintiff's account.  (Exhibit J-18 at 2.)

18        On October 15, 2010, Plaintiff contacted her mother and asked her for help.  (T.R. at

19   43:16-44:5; Testimony of Amelia Reyes.)  Plaintiff's mother came to Plaintiff's house and stayed

20   with her overnight to assist Plaintiff as she was having difficulty getting up and was unable to

21   shower by herself.  (T.R. 59:9-15; Testimony of Amelia Reyes.)  Plaintiff was nauseous and was

22   vomiting.  (T.R. at 38:18-22.)  Plaintiff broke out in a rash on her face, neck and legs and with

23   sores in her mouth causing her difficulty eating.  (T.R. at 37:8-38:4.)  The rash, sores, and nausea

24   resolved after a couple of weeks.  (T.R. at 38:5-11, 40:5-9.)  Prior to this incident, Plaintiff had

25   only a couple of one stress related flare ups of her lupus, the worst of which occurred during her

26   separation from Mr. Alonso.  (T.R. at 44:16-45:11.)

27        On October 28, 2010, Plaintiff contacted a bankruptcy attorney, Mr. Geist.  (T.R. at 47:8-

28   17.)  After meeting with Mr. Geist, Plaintiff decided to file bankruptcy.  (T.R. at 47:18-23.)  At

this time, Plaintiff had $54,863.97 in unsecured debt and was making $3,186.31 per month.  (T.R. at 51:12-20.)  Exhibit 24 at J-24.8.)  Mr. Geist advised Plaintiff that the collection agency could not have a police officer escort her from work.  (T.R. 74:11-18.)

Plaintiff's joint pain and stiffness lasted for several months.  (T.R. at 39:12-19.)  During this lupus flare up, Plaintiff used a walker and shower chair on less than five occasions to assist her due to her symptoms.  (T.R. at 42:21-43:20; 79:6-81:6.)

### III.

### CONCLUSIONS OF LAW

### A.     Violation of the FDCPA

The FDCPA seeks to eliminate the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt" by regulating the type and number of contacts that a collector can make with a debtor.  15 U.S.C. § 1692.  "The purpose of the FDCPA is to protect vulnerable and unsophisticated debtors from abuse, harassment, and deceptive collection practices."  Guerrero v. RJM Acquisitions LLC, 449 F.3d 926, 938 (9th Cir. 2007).

"To establish a claim under the FDCPA, a plaintiff must show: (1) she is a consumer within the meaning of 15 U.S.C. § 1692a(3); (2) the debt arises out of a transaction entered into for personal purposes; (3) the defendant is a debt collector within the meaning of 15 U.S.C. § 1692a(6); and (4) the defendant violated one of the provisions of the FDCPA, 15 U.S.C. §§ 1692a–1692o."  Laugenour v. Northland Group Inc., No. 2:12-cv-02995 GEB DAD PS, 2013 WL 3745727, at *2 (E.D. Cal. July 15, 2013) (citing Moriarity v. Nationstar Mortg., LLC, No. 1:13–cv–0855 AWI SMS, 2013 WL 3354448, at *4 (E.D. Cal. July 3, 2013)).

The FDCPA does not require a mental state to violate it, as it is a strict liability statute.  Cruz v. International Collection Corp., 673 F.3d 991, 997 (9th Cir. 2012).  Under the statute, a "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due . . . to another."  15 U.S.C. § 1692a(6).

9

1.      Plaintiff is a Consumer Under the FDCPA

A consumer under the FDCPA is "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3). Plaintiff is a natural person who incurred the debt at issue here and is thereby obligated to pay the debt. Plaintiff is a consumer within the meaning of 15 U.S.C. § 1692a(3).

2.      The Debt Arises Out of Transactions Primarily for Personal Purposes

The FDCPA defines debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." The Court has reviewed Plaintiff's Voluntary Petition filed in her Bankruptcy action. United States Bankruptcy Petition, Exhibit J-24. The debt purchased by Defendant Blackstone was from a consumer credit card issued by Chase Bank. Id. at J-24.18. The credit card was opened in October 1997 and was last active on June 1, 2008. Id. at J-24.19.

Plaintiff has been employed with Fresno Community Hospital since approximately 1999. Id. at J-24.25. Plaintiff was not involved in, nor did she operate, any business within six years preceding her bankruptcy. Id. at J-24.33; Testimony Michael Alonso. The Court finds that the debt at issue here is debt arising out of a transaction primarily for personal, family, or household purposes within the meaning of 15 U.S.C. § 1692a(5).

3.      Defendants are Debt Collectors Within the FDCPA

A debt collector is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Clearly, Defendant Blackstone is a debt collector under 15 U.S.C. § 1692a(6) as it's primarily function is to collect debt.

Based upon the evidence, the Court finds that Defendant Elsen also qualifies as a debt collector under 15 U.S.C. § 1692a(6). Defendant Elsen recruited, hired, and personally trained all debt collectors on how to work an account, skip trace, and enter information into the Debtor History Report for Defendant Blackstone. Defendant Elsen created all training documents and

the scripts used by the debt collectors in communicating with debtors.  Defendant Elsen was the sole individual monitoring the debt collectors and debt collection activity at Defendant Blackstone on a daily basis.  The main telephone for the business was located on Defendant Elsen's desk.  He was one of the primary individuals who answered the phone and decided which debt collector would speak with the debtor.

Defendant Elsen purchased all debt portfolios, and on at least two occasions, was the individual who worked a debtor's account.  Once a debtor refused to pay, Defendant Elsen would work up the account to be sent to an attorney for a lawsuit to be initiated.  If a debtor failed to honor their payment agreement, such as missing a payment or sending in a bad check, Defendant Elsen would contact the debtor.  Further, Defendant Elsen would contact debtors to obtain updated credit card information on active accounts.

    4. <u>Credibility</u>

During the trial of this matter, Defendant Elsen testified that he did not believe that a representative of Defendant Blackstone engaged in the conduct alleged here.  The Court finds the testimony of Plaintiff, Mr. Alonso, and Ms. Reyes to be credible, however, the Court does find that Mr. Alonso's testimony as to the time of events that occurred is not reliable.

The Court finds the testimony of Defendant Elsen is not credible.  In this action, there were three depositions conducted of Defendant Elsen.  During these depositions, Defendant Elsen continually denied remembering or having knowledge of what occurred during the period of time in which Defendant Blackstone was actively engaged in debt collection.  This Court finds Defendant Elsen's testimony during the trial to be riddled with numerous falsities.

During his trial testimony, Defendant Elsen was repeatedly impeached with his prior deposition testimony.  (T.R. at 105:4-109:17, 110:2-9; 123:25-126:2, T.R.2 at 8:19-10:2; 40:8-41:12; 50:15-51:15; 55:16-56:16, 72:20-74:23; 75:24-77:8; 95:24-96:2; 96:24-97:10.)  Defendant Elsen testified that he suddenly remembered information or the information "came to him" the night before while reviewing the exhibits of which he previously denied knowledge.  (T.R.2 at 57:23-58:7, 59:3-60:12.)

During his depositions, Defendant Elsen was unable to remember any employee who had

worked for Defendant Blackstone.  It was only at his third deposition, after Ms. Blankenship's name was mentioned in one of the lawsuits filed against Defendant Blackstone that Defendant Elsen "remembered" that she had worked for Defendant Blackstone.  This is despite the fact that she is still working for one of his companies.  Similarly, upon examination and impeachment evidence offered by Plaintiff during the trial of this matter, Defendant Elsen was suddenly able to remember that Lee Valenzuela worked for Defendant Blackstone and is still working for one of his active companies.  (T.R.2 at 139:24-140:17, 142:19-143:11.)

Defendant Elsen also testified that these employees were able to be reached at a phone number and e-mail address that was identified with Blackstone.  The employees have retained the Blackstone phone numbers and e-mail addresses because they have debtors with payment plans through Blackstone. (T.R. 2 at 143:3-10.)  These debt collectors would have debtors who were paying Blackstone until the year 2025.  In order for these debtors who had payment plans in place to contact the debt collector, the debt collectors maintained their Blackstone phone numbers and e-mail addresses.  (T.R. 2 at 143:12-144:10.)  It is clear that Defendant Elsen would be able to identify those employees who had worked for Defendant Blackstone and were still working for his companies and collecting on Blackstone debts.

Defendant Elsen testified that no employment records were kept for Defendant Blackstone.  Given that Defendant Blackstone was paying its employees on an hourly basis, the Court finds it incredible that no employment records were kept.  Under both Federal and State law Defendant Blackstone would have been required to maintain employment records.  Filing the required tax forms (including payroll tax records) would require some type of record keeping and retention of these records for tax purposes if for no other reason.

While Defendant Elsen testified that on October 11, 2010, there were seventeen debt collectors working for Defendant Blackstone, the Court only finds evidence that there were two employees of Defendant Blackstone on this date, the female who answered the phone when Plaintiff called and Defendant Elsen.  Defendant Blackstone did not have any personnel files, training records, payroll records, tax forms, etc. that would be kept in the normal course of conducting a business.

The only record produced, Plaintiff's Debtor History Report, referenced the alias of the debt collector.  The Debtor History Report for Plaintiff shows that her account was assigned to a debt collector with the initials EMC.  Defendant Elsen contends that there was no debt collector that used the alias Steven Darwin, however, the Court finds that this testimony is not credible.  Further, the Court notes that the debt collector who originally left the message with Mr. Alonso for Plaintiff to return the call used the last name Carmichael which is consistent with the initials on the Debtor History Report for Plaintiff's account.

Finally, prior to the date that the representative of Defendant Blackstone contacted Plaintiff, Defendant Elsen had been served with a number of lawsuits alleging similar conduct to that complained of by Plaintiff.  Defendant Elsen contends that he did not believe the truth of these allegations, and therefore, never confronted the individual debt collectors that were alleged to have engaged in the misconduct.  To the extent that Defendant Elsen had any individuals employed as debt collectors, his failure to keep records to identify any of his employees and his deliberate disregard of the allegations of misconduct by his debt collectors allowed the conduct which occurred here.  The communications by the debt collector in this action are the specific type of conduct which the FDCPA was enacted to prevent.

Simply put, based upon Defendant Elsen's testimony during the trial of this matter it became clear that he knowingly made false statements during his depositions in this matter.  During his depositions, Defendant Elsen stated that he was unsure if there were any actions against Defendant Blackstone or that there might have been one or two, when he was aware of at least nine to ten lawsuits that had been filed or threatened against Defendant Blackstone.  Plaintiff Elsen's testimony in this matter shows his utter disregard for what it means to "swear to tell the truth."

It is not contested that a representative of Defendant Blackstone contacted Mr. Alonso and told him to have Plaintiff return the phone call.  It is the actual identity of the individual who placed the call and later spoke with Plaintiff identifying himself as Steven Darwin that is at issue.  Defendant Elsen's inability to provide the names of any employee that worked for Defendant Blackstone indicates to this Court that Defendant Elsen either 1) did not hire employees for

13

Defendant Blackstone other than the woman who answered the phone and Defendant Elsen was Steven Darwin; or 2) that disclosing the identity of these employees would lead Plaintiff to discover the actual identity of Steven Darwin was Defendant Elsen.

As shown by the testimony at trial, it appears that Defendant Elsen was the individual who identified himself as Steven Darwin and spoke with Plaintiff:

> Q.   And can you explain how that bonus system worked at Blackstone in about October of 2010?
>
> A.   I think we went over this at my deposition.  I don't -- the -- I've changed the bonus structure so many times that I don't recall exactly how the bonus structure was in 2010.  If you would have contacted me, like I said, when we filed the lawsuit or contacted me in 2011 or **whenever I spoke – first talked to Ms. Alonso in 2010,** I would have had a better idea.  But like I said, we've -- I've had -- I just changed the bonus program again a month ago.  So I've changed the bonus program numerous times.

(T.R. at 113:11-21 (emphasis added).)

The Court finds that based upon Defendant Elsen's obstructive testimony during his deposition, his selective memory regarding the employees or operations of Defendant Blackstone, his inexplicable failure to maintain any records and his testimony at trial that Defendant Elsen is Steven Darwin.

### 5.   Violations of the FDCPA

Plaintiff alleges that Defendants Blackstone and Elsen violated the FDCPA because an agent of Defendants 1) communicated with her ex-husband regarding the debt, without her prior consent, in violation of 15 U.S.C. § 1692c(b); falsely identified himself as "Officer Carmichael" in violation of 15 U.S.C. § 1692b; 3) assumed the identity of a law enforcement officer and provided a "case number" in violation of 15 U.S.C. § 1692d; 4) falsely identified himself as "Officer Carmichael" and threatened to garnish Mr. Alonso's wages and threatened to have an officer come to Plaintiff's work to escort her out in violation of 15 U.S.C. § 1692e; 5) falsely identified himself as a law enforcement officer in violation of 15 U.S.C. § 1692e(1); 6) misrepresented the status of the debt by threatening to have Plaintiff escorted from work by a law enforcement officer if she did not make a payment in violation of 15 U.S.C. § 1692e(2)(A); 7) represented that Mr. Alonso's wages could be garnished and that Plaintiff would be subject to

1    arrest if she did not make a payment in violation of 15 U.S.C. § 1692e(4); 8) threatened to garnish

2    Mr. Alonso's wages or have Plaintiff arrested without the intent to nor could he do so in violation

3    of 15 U.S.C. 1692e(5); 9) falsely represented that Plaintiff had committed a crime in violation of

4    15 U.S.C. § 1692e(7) and California Civil Code § 1788.17; 10) falsely assumed the identity of a

5    law enforcement officer and threatened to garnish Mr. Alonso's wages and have Plaintiff arrested

6    if she did not make a payment in violation of 15 U.S.C. § 1692e(10) and California Civil Code §

7    1788.17; 11) implied that he was working with or speaking on behalf of a law enforcement officer

8    and threatened legal enforcement in violation of 15 U.S.C. § 1692f and California Civil Code §

9    1788.17; and 12) failed to send a written notice within five days of the initial communication in

10   violation of 15 U.S.C. § 1692g.[3]

11       Determining whether a debt collector's statements violate Sections 1692d, 1692e, or

12   1692f requires an objective analysis that takes into account whether "the least sophisticated

13   debtor would likely be misled by the communication." Donohue v. Quick Collect, Inc., 592 F.3d

14   1027, 1030, 1033 (9th Cir. 2010) (quoting Guerrero, 499 F.3d at 934).

15       **a.    15 U.S.C. § 1692c(b)**

16       Plaintiff alleges that Defendants violated Section 1692c(b) by contacting her ex-husband.

17   Section 1692c(b) prohibits a debt collector from contacting a third party without the prior consent

18   of the debtor. The FDCPA definition of consumer includes the spouse of the debtor. 15 U.S.C. §

19   1692c(d). In this instance, Plaintiff alleges that a representative contacted Mr. Alonso and since

20   he was her ex-husband this contact violated the statute. However, there is no evidence to show

21   that once Mr. Alonso informed "Officer Carmichael" that he and Plaintiff were divorced the

22   attempts to discuss her debt continued. According to Mr. Alonso, once he informed "Officer

23   Carmichael" that he and Plaintiff were divorced no further comments were made regarding

24   garnishing his wages.

25   _____

26   [3] In the pretrial order, the Court found that the points of law in the parties' pretrial statements were insufficient to
     address the claims that were proceeding in this action and required the parties to file trial briefs. (Pretrial Order 4,
     ECF No. 75.) The parties were ordered to outline the claims that were proceeding in this action. (Id. at 12.)

27   Accordingly, the Court deems any claims which were not included in the parties' trial briefs to have been waived.
     See Valley Ranch Dev. Co., Ltd. v. F.D.I.C., 960 F.2d 550, 554 (5th Cir. 1992). Therefore, the Court will only

28   address the twelve violations alleged in Plaintiff's trial brief.

1    While the FDCPA is a strict liability statute, it provides that a debt collector is not liable

2  for any action where the debt collector shows by a preponderance of the evidence that the

3  violation was not intentional and resulted from a bonafide error.  15 U.S.C. § 1692k(c).  The

4  debtor history report reflects that the individual working the account found that Plaintiff's spouse

5  was the owner of several pieces of property indicating the belief that Plaintiff and Mr. Alonso

6  were still married.  Exhibit J-18 at 1.

7    The Court finds nothing to show that the debt collector working this account had

8  knowledge that the Alonsos were divorced prior to communicating with Mr. Alonso.  Therefore,

9  the debt collector would have a reasonable belief that he could contact Mr. Alonso regarding

10  Plaintiff's debt.  Further, there is no evidence that once the debt collector was informed that

11  Plaintiff and Mr. Alonso were no longer married that any comments were made other than a

12  request for Mr. Alonso to give Plaintiff the message to return the call.  The Court finds that

13  Plaintiff has not presented evidence to prove that the contact with Mr. Alonso violated 15 U.S.C.

14  § 1692c(b).

15    **b.    15 U.S.C. § 1692b**

16    Plaintiff contends that Defendants violated section 1692b which sets forth what a debt

17  collect can and cannot do in contacting a third party to acquire location information about the

18  consumer.  Since the Court has found that Defendant Blackstone did not know that Mr. Alonso

19  was a third party under the statute prior to contacting him, any violation would only have

20  occurred after Mr. Alonso informed the representative of Defendant Blackstone that he and

21  Plaintiff were divorced.  As discussed above, the evidence before the Court shows that once the

22  representative was aware that Mr. Alonso and Plaintiff were divorced the only communication

23  was to request Mr. Alonso to have Plaintiff return the phone call.  There is no evidence that the

24  representative of Defendant Blackstone violated section 1692b during the communication with

25  Mr. Alonso.

26    **c.    15 U.S.C. § 1692d**

27    Section 1692d prohibits a debt collector from engaging "in any conduct the natural

28  consequence of which is to harass, oppress, or abuse any person in connection with the collection

16

of a debt." Plaintiff contends that the representatives of Defendant Blackstone violated the statute by assuming the identify of a law enforcement officer, misrepresenting that Mr. Alonso's wages would be garnished, referencing a case number, and threatening to have Plaintiff escorted from her work. The statute identifies a non-exhaustive list of conduct that would violate section 1692d, such as the use of threat of violence or other criminal means, the use of obscene or profane language, publication of a list of consumers who refuse to pay debts, advertisement for sale of debt to coerce payment, causing the phone to ring or engaging a person in telephone conversation repeatedly and continuously, and failing to meaningfully disclose the caller's identity. 15 U.S.C. § 1692d(1-6).

While the conduct at issue here is not specifically identified in section 1692, similar conduct has been found to violate section 1692d. See Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507, 1516 (9th Cir. 1994) (threatening and intimidating calls to a consumer at an inconvenient time or place can support a finding of harassing conduct where debt collector made threats of garnishment, demanded overnight payment and continued to call the debtor at work after she requested not to be called at her place of employment); Dunn v. Advanced Credit Recovery, Inc., No. 11 Civ. 4023 (PAE) (JLC), 2012 WL 676350, at *3 (S.D.N.Y. Mar. 1, 2012) (debt collector violated 1692d by berating the debtor while attempting to collect the debt, including threatening debtor with lawsuit and arrest and swearing at her); Shapiro v. Professional Collection Consultants, No. CV 11-03347 ODW (JCx), 2011 WL 4500114, at *2 (C.D. Cal. Sept. 28, 2011) (allegations that debt collector called debtor a disappointment, threatened to take her for all she was worth, to close her bank account and hide her is car sufficient to state a claim for violation of section 1692d). "Moreover, as the Federal Trade Commission has explained, the applicability to the same conduct of multiple subsections of the Act 'results from the effort by Congress in drafting the FDCPA to be both explicit and comprehensive, in order to limit the opportunities for debt collectors to evade the under-lying legislative intention.' " Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1178 (9th Cir. 2006) (quoting 53 Fed.Reg. at 50,101).

In this action, the representative of Defendant Blackstone assumed the identity of an

17

1    "officer", configured the account number to resemble a legal case number, and referred to the

2    number as a case number.  Further, after Plaintiff returned the call, Mr. Darwin threatened to have

3    an officer come and escort Plaintiff from her work.   This conduct could mislead an

4    unsophisticated debtor to believe that the collection agency was associated with law enforcement.

5    The Court finds that the representative of Defendant Blackstone violated section 1692d by

6    impersonating an officer, providing a "case no.", and threatening to have an officer escort

7    Plaintiff from her work if she did not tender payment by the end of the day.

8         **d.**      **15 U.S.C. § 1692e**

9         Plaintiff contends that Defendants violated section 1692e by the representative of

10   Defendant Blackstone falsely identifying himself as "Officer Carmichael" and threatening to

11   garnish Mr. Alonso's wages and threatening to have an officer come to Plaintiff's work to escort

12   her out.  Section 1692e provides that "[a] debt collector may not use any false, deceptive, or

13   misleading representation or means in connection with the collection of any debt."

14        At the time that the representative of Defendant Blackstone initially spoke with Mr.

15   Alonso, he was under the impression that Plaintiff and Mr. Alonso were still married.  Defendants

16   have presented evidence that when a debtor refused to pay their debts and was either employed or

17   owned property, Defendant Elsen would prepare the account to be sent to a lawyer so a lawsuit

18   could be filed against the debtor.  In this instance, Plaintiff and Mr. Alonso were both employed

19   and the debt collector had identified two pieces of property owned by Mr. Alonso.  See Exhibit J-

20   18 at 1-2.  While a lawsuit was not filed against Plaintiff in regards to the debt she owed, Plaintiff

21   has failed to prove that at the time the statement was made there was no intent on behalf of

22   Defendants Blackstone and Elsen to file such a suit which could have resulted in the garnishment

23   of the wages of Plaintiff and Mr. Alonso.  The Court finds that the representation that either Mr.

24   Alonso or Plaintiff's wages could be garnished should Ms. Alonso fail to pay her debt did not

25   violate section 1692e.

26        However, the Court finds that by identifying himself as "Officer Carmichael" and

27   providing a case number that had been configured to appear as a legal case number, the debt

28   collector made a false representation that he was affiliated with law enforcement.  Further, when

1    Plaintiff returned the call, "Steven Darwin" stated that he was affiliated with Officer Carmichael

2    and was taking his calls.  He also threatened to have Officer Carmichael come to Plaintiff's work

3    and escort her out if she failed to make a payment by the end of the day.  The Court finds that this

4    conduct violates section 1692e(1), which prohibits the false representation or implication that the

5    debt collector is vouched for . . . or affiliated with" law enforcement.

6          Additionally, by insinuating that Plaintiff would be arrested for failure to pay her debt, the

7    debt collector made a false representation regarding the character of the debt in violation of

8    section 1692e(2)(A), that failure to pay the debt would result in Plaintiff's arrest or seizure in

9    violation of section 1692e(4), the threat of legal action that could not be taken in violation of

10   section 1692e(5), the false implication that Plaintiff committed a crime in violation of 1692e(7),

11   and the use of false and deceptive means in an attempt to collect the debt in violation of section

12   1692(e)10.

13         **k.        15 U.S.C. § 1692f**

14         Plaintiff alleges that Defendants violated section 1692f by implying that he was working

15   with or speaking on behalf of a law enforcement officer and threatened legal enforcement.

16   Section 1692f prohibits a debt collector from using any unfair or unconscionable means to collect

17   or attempt to collect a debt.  In determining if the debt collection communication violated section

18   1692f the Court is to apply the unsophisticated consumer test because the FDCPA's purpose is to

19   protect consumers of below-average sophistication and who are especially vulnerable to

20   unscrupulous debt collectors.  Turner v. J.V.D.B & Assoc., Inc., 330 F.3d 991, 997 (7th 2003).  In

21   applying this standard, the Court views "the communication through the eyes of an

22   unsophisticated, but reasonable, consumer." Turner, 330 F.3d at 997.

23         Applying the unsophisticated debtor standard, the Court finds that implying that the caller

24   was a law enforcement officer, and threatening to have Plaintiff escorted from her work by an

25   officer violates Section 1692f.  Conduct much less egregious than this has been found to

26   constitute a violation of Section 1692f.  See Dunn, 2012 WL 676350 at *3 (finding violation of

27   1692f where debt collector falsely represented herself as a lawyer); Cuevas v. Check Resolution

28   Services, No.2:12-v-00981-KJM KJN,   2013 WL2190172, at *7 (E.D. Cal. May 20, 2013)

1    (allegation that debt collector falsely represented that a lawsuit was pending against the debtor

2    was sufficient at default judgment to allege violation of section 1692f.)

3        **l.      15 U.S.C. § 1692g**

4        Finally, Plaintiff alleges that Defendants failed to send a written notice within five days of

5    the initial communication in violation of 15 U.S.C. § 1692g.  Section 1692g provides that the debt

6    collector must provide the debtor with written notice providing the debtor with information on the

7    debt.  During the trial of this matter, there was no evidence presented regarding lack of notice.

8    Accordingly, Plaintiff has failed to carry her burden of proof; and the Court finds that the

9    evidence is insufficient to find a violation of section 1692g.

10       **B.      Violation of the RFDCPA**

11       In order to promote consistent state action, the RFDCPA incorporates the majority of the

12   FDCPA in California Civil Code Section 1788.17.  Costa v. National Action Financial Services,

13   634 F.Supp.2d 1069, 1077 (E.D. Cal. 2007).  Section 1788.17 provides that, in collecting or

14   attempting to collect a consumer debt, debt collectors shall comply with the provisions of the

15   FDCPA.  Because the RFDCPA "mimics or incorporates by reference the FDCPA's requirements

16   . . . and makes available the FDCPA's remedies for violations", Riggs v.Prober & Raphael, 681

17   F.3d 1097, 1100 (9th Cir. 2012), violations of the FDCPA also violate the RFDCPA., Costa, 634

18   F.2d at 1077.  A plaintiff may recover damages for both violation of the FDCPA and RFDCPA.

19   Id. at 1077.

20       The debt at issue here is the type of debt covered under the RFDCPA as it is a consumer

21   credit transaction.  Gouskos v. Aptos Village Garage, Inc., 94 Cal.App. 4th 759 (2001).  For the

22   reasons stated above, those acts found to violate the FDCPA also violate California Civil Code

23   Section 1788.17, and Plaintiff is entitled to recover damages under the corresponding sections of

24   the RFDCPA.

25       **C.      Plaintiff's Damages**

26       Plaintiff is entitled to statutory and actual damages for Defendants Blackstone and Elsen's

27   violation of the FDCPA and RFDCPA.  Under the FDCPA and RFDCPA, Plaintiff may receive

28   up to $1000.00 in statutory damages for each lawsuit filed.  15 U.S.C. § 1692k; Cal. Civ. Code §

1788.30(b); <u>Nelson v. Equifax Information Services, LLC</u>, 522 F.Supp.2d 1222, 1238 (C.D. Cal. 2007); <u>Costa</u>, 634 F. Supp.2d at 1077.  Statutory damages under the RFDCPA are intended to be cumulative.  Cal. Code Civ. Proc. § 1788.32.  Therefore, awarding damages under each act is not double recovery and a plaintiff who proves a violation is entitled to statutory damages under both the FDCPA and RFDCPA.  <u>Costa</u>, 634 F.Supp 2d at 1077.

In determining the amount of statutory damages to award, the Court is to consider "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional."   15 U.S.C. 1692k(b)(1).   The incidents here involved one conversation with Mr. Alonso and three conversations between Ms. Alonso and the debt collector.  In the conversation with Mr. Alonso and two of the conversations with Plaintiff, the debt collector insinuated that he was connected to law enforcement or threatened to have Plaintiff arrested if she failed to make a payment on the debt.  This was intentional conduct for the purpose of intimidating Plaintiff into paying off the debt.  Considering these factors, the Court finds that Plaintiff is entitled to statutory damages of $1,000.00 for the violations of the FDCPA and the RFDCPA, for a total of $2,000.00 in statutory damages.

Based upon the evidence presented at trial, Plaintiff paid Defendant Blackstone a payment of $100.00 due to the violations of the FDCPA.  As the Court has previously found in the Order Granting in Part Defendants' Motion for Summary Judgment, Plaintiff is entitled to actual damages for the monies which were paid to Defendant Blackstone based upon the acts which violated the FDCPA.  Plaintiff is awarded $100.00 in actual damages.

Additionally, as discussed in the prior order, Plaintiff is entitled to damages for emotional distress and the pain and suffering she experienced due to the flare up of her medical condition.  Here, Plaintiff needed the help of her mother due to the severity of her symptoms.  Plaintiff's mother came over on the Saturday following the communications with the debt collector and stayed with Plaintiff for one evening.  Plaintiff's symptoms of nausea, vomiting, and pain were most severe for the three to five days following the communication with Defendant Blackstone. Plaintiff took her prescription pain medication for three days and then was able to relieve her pain

1    with over the counter pain medications.  Plaintiff's rash, mouth sores and nausea resolved after a

2    couple of weeks and her pain and stiffness resolved after a couple of months.  Plaintiff used a

3    walker and shower chair less than five times following the flare up of her lupus.

4           Further, Plaintiff did not miss any work due to her symptoms and her symptoms were not

5    severe enough for her to make the trip to San Francisco to see the specialist treating her lupus.

6    Considering the severity and length of the symptoms experienced by Plaintiff, the Court awards

7    Plaintiff $2,700.00 for pain and suffering.

8           The Court awards Plaintiff damages of $4,800.00 as discussed herein for the violations of

9    the FDCPA and RFDCPA.

10                                                **IV.**

11                                          **CONCLUSION**

12          For the foregoing reasons, the Court enters judgment in favor of Plaintiff and against

13   Defendants Blackstone and Elsen on Plaintiff's claims for violation of the FDCPA and RFDCPA

14   and awards Plaintiff $4,800.00 in damages.  The Clerk of the Court is directed to enter judgment

15   for Plaintiff and against Defendants and close this action.

16

17   IT IS SO ORDERED.

18      Dated:   **December 20, 2013**       _____

19                                            UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28